The Full Commission has reviewed this matter based on the record of the proceedings before Deputy Commissioner John A. Hedrick, and the briefs and oral arguments on appeal. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the Opinion and Award of 10 June 1996 or the Interlocutory Opinion and Award of 23 January 1996.
* * * * * * * * * * *
Following the 23 January 1996 Interlocutory Opinion and Award, the parties submitted medical evidence and a set of plaintiff's medical records, consisting of records from Highsmith-Rainey Memorial Hospital and Dr. Bruce Jaufmann, and these were admitted into evidence by stipulation. Additionally, a 1994 Form 1099 for John Robert Edge is admitted into evidence.
* * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing on 30 November 1995, plaintiff was thirty-eight years old. Plaintiff had completed high school. His work history consisted primarily of employment as a mechanic, but he had also worked as a laborer. Defendants were engaged in the business of used automobile repairs and sales. Defendants' practice was to purchase used automobiles, make repairs which they deemed to be financially prudent, and then sell the cars to retail consumers from their used car lot.
2. Prior to May 1994, plaintiff owned and operated his own business, Boulevard Auto Repair and Mechanical Investigations. James D. Melvin, Sr. approached plaintiff about working for defendants. Plaintiff then met with both individual defendants, and the three of them agreed that plaintiff would work for defendants as the manager of defendants' repair shop.
3. The parties further agreed that plaintiff's rate of pay would be $100.00 per day plus 15% of parts and labor billed by defendants' shop. From May 1994 through 31 December 1994, plaintiff earned $27,286.00 as repair shop manager for defendants. In addition to his regular pay, defendants paid plaintiff a Christmas bonus in 1994.
4. When he began working for defendants, plaintiff transferred the telephone number of his former business to the number of defendants' business. Although plaintiff primarily worked on automobiles owned by defendants, he also performed repairs for the general public and for his former customers at Boulevard Auto Repair and Mechanical investigations. Payments for all repairs made on vehicles not owned by defendants (those made for the general public and plaintiff's former customers) were made to defendants.
5. While working for defendants, defendants paid for plaintiff to attend a course to learn about repairing Chrysler automobiles. Defendants also reimbursed plaintiff for fuel expenses incurred in traveling to and from the Chrysler course.
6. When plaintiff began working for defendants, he did not agree to work for a definite period of time. Plaintiff and defendants were free to terminate their relationship at any time and neither would be indebted to the other. Plaintiff did not pay for the expenses he incurred while working for defendants. Plaintiff had no investment in defendants' business.
7. Plaintiff was allowed to exercise some discretion in the performance of his position as repair shop manager. However, defendants limited the amount of repairs that could be made on defendants' automobiles. Plaintiff was required to obtain permission from defendants before exceeding the limit defendants had placed on repairs.
8. While working for defendants, plaintiff was not engaged in his own business. He did not perform a specified task for a specific price. Plaintiff did not work for any other automobile repair business. Plaintiff was not allowed to hire or discharge his own assistants. Plaintiff's work hours were regular and were controlled by defendant. During the course of his relationship with defendants, defendants expanded their business hours to include certain hours on Saturdays. At this time, defendants began requiring plaintiff to work on Saturdays.
9. When plaintiff began working for defendants he took he took his automobile repair tools, equipment and manuals with him to defendants' place of business. Plaintiff took these items to defendants' repair shop because he had nowhere to store them and he was not prepared to sell the items until he decided whether he would continue working for defendants.
10. On 19 January 1995, James Gibson and several other persons worked for defendants as mechanics, repairing automobiles purchased by defendants for re-sale. The mechanics were paid an hourly rate for repairs made. The number of hours the mechanics were paid for performing certain repairs was set by defendants.
11. Mr. Gibson did not work for any other business. He did not advertise his services, his expenses were paid by defendants and his work hours were set by defendants. Defendants did not provide Mr. Gibson with keys to the repair shop. He had no authority to hire or discharge assistants. He could not perform all repairs he thought were necessary. Defendants did not provide workers' compensation insurance coverage for plaintiff, Mr. Gibson or any other individual who worked for them.
12. Following plaintiff's alleged injury, defendants promoted Mr. Gibson to the repair shop manager position previously held by plaintiff. When defendants' business became incorporated in July 1995, it continued carrying on the same business, it the same location and in the same manner, as it had on 19 January 1995. After the business was incorporated, Mr. Gibson and the other persons working for the business were provided with workers' compensation insurance coverage, however, the insurance premium was paid by the corporate entity with funds deducted from the earnings of its workers.
13. On 19 January 1995, Mr. Wilbert Stephenson worked for defendants as a car salesman. When he began working for defendants, he earned a commission for each car he sold. He later became defendants' sales manager, at which time defendants increased his commission rate. Defendants set the prices on the vehicles sold by Mr. Stephenson. Mr. Stephenson placed classified advertisements which were paid for by defendants. His business telephone was also paid for by defendants. Defendants paid Mr. Stephenson a Christmas bonus. Mr. Stephenson had no authority to hire or discharge his assistants.
14. The prices for repairs performed in defendants' shop, including the hourly rate for labor and the mark-up on parts, were determined by defendants.
15. The individual defendants were involved in starting defendants' business and were involved in daily operations of the business at all times relevant to this claim.
16. On 19 January 1995, Mr. Melvin, III instructed plaintiff to get a metal work table down from the top of a storage shed. Plaintiff jumped up, grabbed the table, and put his feet against the side of the building so that he could push back and pull the table off of the roof. When he came down, he lost his footing and fell backwards onto a large barrel that had been cut open, injuring his back.
17. On 19 January 1995, plaintiff's average weekly wage was $852.68, which was sufficient to yield the applicable maximum compensation rate of $478.00.
18. Following his injury on 19 January 1995, plaintiff spoke to James Melvin, Sr. regarding compensation for his injury. Mr. Melvin refused to pay plaintiff any compensation and terminated plaintiff when he expressed his intent to bring the matter to the attention of the Industrial Commission.
19. Defendants did not provide workers' compensation insurance for plaintiff, Mr. Gibson, Mr. Stephenson or any other individual who worked for them from 19 January 1994 through 30 June 1995.
20. Plaintiff's average weekly wage was $852.69.
21. After the incident on 19 January 1995, plaintiff reported his injury to defendants. He then presented to the Highsmith-Rainey Memorial Hospital emergency room. At the time of his examination in the emergency room, plaintiff was experiencing pain in the left side of his low back and pain and numbness in his right leg. Plaintiff was prescribed medication and physical therapy.
22. Plaintiff's pain from his injury continued, and he began physical therapy on 26 January 1995. Plaintiff's physical therapy alleviated his lower back pain, but he continued having radicular symptoms in the nature of right leg pain. Plaintiff discontinued physical therapy on 20 February 1995, because defendants had no workers' compensation insurance coverage and would not pay for his medical treatment.
23. On 31 January 1995, plaintiff presented to Dr. Bruce Jaufmann, a neurosurgeon. On that date, plaintiff continued to experience tenderness in the lower lumbar area and hypesthesia down the posterior right leg, posterolateral thigh, and lateral aspect of the foot. Dr. Jaufmann prescribed physical therapy and medication. Dr. Jaufmann excused plaintiff from work until his next appointment.
24. When Dr. Jaufmann saw plaintiff again on April 4, 1995, he had less pain but remained unable to lift or perform aggressive physical work without back and leg discomfort. Dr. Jaufmann instructed plaintiff to follow up as necessary.
25. When Dr. Jaufmann last saw plaintiff on March 11, 1996, he continued to have back pain and pain that radiated into his buttocks, posterior thigh and posterior calf to the ankle. As a result of the continued pain and difficulty lifting, plaintiff is unable to return to his job as an automobile mechanic.
26. As a result of his injury on 19 January 1995, plaintiff has a five percent permanent impairment of his back.
27. On 16 February 1995, plaintiff spoke to defendants about continuing to work for them as a supervisor. At that time, James Melvin, Sr. informed plaintiff that he was terminated.
28. Since his injury, plaintiff has been physically unable to perform all of his previous duties as an auto mechanic. Plaintiff unsuccessfully sought alternative employment as a service writer or foreman in service departments and small shops.
29. At the end of June, 1995, plaintiff began to work for his father who operated a motel. Plaintiff earned $300.00 per week and he continued to be so employed through the date of the hearing.
30. As a result of his injury on 19 January 1995, plaintiff was incapable of earning wages from defendants or any other employers from 20 January 1995 through 22 June 1995.
31. As a result of his injury on 19 January 1995, plaintiff's capacity to earn wages was diminished by $552.69 per week from 22 June 1995 and continuing through the date of the hearing in this matter.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On 19 January 1995, defendants regularly employed three or more employees. G.S. § 97-2(1).
2. On that date, defendants were subject to and bound by the provisions on the North Carolina Workers' Compensation Act. G.S. § 97-1, et sec.
3. On that date, an employment relationship existed between plaintiff and defendants. G.S. § 97-2.
4. On 19 January 1995, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendants. G.S. § 97-2(6).
5. From 19 January 1994 through 30 June 1995, defendants failed to carry workers' compensation insurance or furnish proof of their financial ability to pay compensation in the amount and manner due as provided in the North Carolina Workers' Compensation Act. G.S. § 97-93.
6. Defendants are subject to a penalty of not less than $50.00 nor more than $100.00 per day for the period that that they refused or failed to comply with the provisions of G.S. § 97-93; G.S. § 97-94.
7. The deduction of funds from an employee's pay for the purpose of paying workers' compensation insurance premiums is a misdemeanor. G.S. § 97-21.
8. As a result of his injury on 19 January 1995, plaintiff is entitled to payment of temporary total disability compensation at the rate of $478.00 per week from 20 January 1995 through 22 June 1995. G.S. § 97-29.
9. As a result of his injury on 19 January 1995, plaintiff is entitled to payment of temporary partial disability compensation at the rate of $368.48 per week from 23 June 1995 and continuing for 300 weeks from 19 January 1995, less the number of weeks during which plaintiff received temporary total disability compensation, or until order of the Industrial Commission allowing defendants to cease payment of temporary partial disability compensation. G.S. § 97-30.
10. Defendants shall pay all reasonable medical expenses incurred by plaintiff as a result of his injury on 19 January 1995. G.S. § 97-25.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $478.00 per week from 20 January 1995 through 22 June 1995. This amount shall be paid in a lump sum, subject to the attorney's fee approved in paragraph (4) of this Award.
2. Defendants shall pay plaintiff temporary partial disability compensation at the rate of $368.48 per week from 23 June 1995 and continuing for 300 weeks from 19 January 1995, less the number of weeks during which he received temporary total disability compensation, or until order of the Industrial Commission allowing defendants to cease payment of temporary partial disability compensation. This amount, to the extent that it has accrued, shall be paid in a lump sum, subject to the attorney's fee approved in paragraph (4) of this Award.
3. Defendants shall pay all reasonable medical expenses incurred by plaintiff as a result of his injury on 19 January 1995.
4. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraphs (1) and (2) of this Award shall be paid as follows: twenty-five percent of the lump sums due plaintiff shall be deducted from those amounts and paid directly to plaintiff's counsel. Until defendants are allowed by order of the Industrial Commission to cease payment of partial incapacity compensation, plaintiff's counsel shall receive every fourth check.
5. Defendants shall pay the costs.
* * * * * * * * * *
ORDER
1. IT IS ORDERED that this case be RETURNED to the Fayetteville hearing docket for a hearing to determine what penalty is appropriate for defendants' failure to comply with G.S. § 97-93. This case may thereafter be removed from the penalty hearing docket only upon the receipt of satisfactory proof that defendants have paid or will pay the compensation due plaintiff under this Award and that defendants presently provide workers' compensation insurance coverage for their employees or that they are not presently subject to the North Carolina Workers' Compensation Act.
2. Defendants shall pay the costs.
 S/ ___________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ___________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ___________________________ DIANNE C. SELLERS COMMISSIONER